IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| **DARROW LYNN KELLEY, as the Temporary Administrator of the Estate of Edna Horton,**<br><br>     Plaintiff,<br><br>     v.<br><br>**GGNSC TIFTON LLC and GGNSC EQUITY HOLDINGS, LLC,**<br><br>     Defendants. | Civil Action No. 7:11-cv-5 (HL) |

### ORDER

Before the Court is Defendants' GGNSC Tifton LLC and GGNSC Equity Holdings, LLC (collectively, "Defendants") Motion for Partial Summary Judgment (Doc. 35). For the reasons stated below, the Motion is granted.

I.   **BACKGROUND**

Plaintiff Darrow Lynn Kelley, the Temporary Administrator of the Estate of Edna Horton, filed this action against Defendants alleging claims of negligence, professional negligence, and negligence per se. These claims arise out of the treatment and care of Edna Horton at Golden Living Center in Tifton ("Golden Living"), a long-term care facility located at 1451 Newton Drive, which is owned and operated by Defendants.

Ms. Horton was admitted to Golden Living on or around November 10, 2009 and she lived there until April 5, 2010. (Defendants' Statement of Material

Facts ("DSMF") ¶ 2.[1]) In December 2009, while Ms. Horton was under the care of Golden Living, she developed a pressure ulcer on her coccyx area, which is around the tailbone. (DSMF ¶ 6.) The pressure ulcer worsened, and Ms. Horton was eventually referred to a wound care specialist because the wound was not improving. (DSMF ¶18.) The ulcer eventually reached Stage IV status, the most severe level of ulcer. (Deposition of Verdella Evans, Doc. 35-3, p. 41-42.)

Plaintiff claims that Ms. Horton's pressure ulcer was not properly treated by the staff at Golden Living, which caused the deterioration of the wound. (DSMF ¶ 3.) Plaintiff also claims that Defendants were negligent in the general care and treatment of Ms. Horton, alleging that she suffered from dehydration, volume depletion, acute renal failure, sepsis, and a urinary tract infection while she was a resident at Golden Living. (DSMF ¶ 4.) Defendants respond to these allegations by denying negligence in the treatment and care of Ms. Horton. Defendants claim that they treated the pressure ulcer and took steps to ensure Ms. Horton had adequate food and nutrition, but that Ms. Horton often hindered her own treatment, exacerbating her condition.

Plaintiff seeks both compensatory and punitive damages. Defendants have moved for partial summary judgment on the issue of punitive damages.

---

[1] All citations to the Defendants' Statement of Material Facts refer to facts that have been admitted by Plaintiff.

## II. DISCUSSION

Punitive damages are only available in certain cases. These damages are authorized "not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c). Georgia law dictates that punitive damages are only appropriate in those tort actions "in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Conscious indifference to consequences occurs when there is "an intentional disregard of the rights of another." Carter v. Myers, 204 Ga. App. 498, 500, 419 S.E.2d 747, 749 (Ga. App. 1992) (internal citations omitted). "Negligence, even gross negligence, is inadequate to support a punitive damages award. … Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage." Lindsey v. Clinch Co. Glass, Inc., 312 Ga. App. 534, 534, 718 S.E.2d 806, 807 (Ga. App. 2011) (internal citations omitted).

In this case, Plaintiff argues that punitive damages are appropriate to punish Defendants for the substandard care provided to Ms. Horton at Golden Living. However, the Court is unconvinced that punitive damages are appropriate in this case. The evidence shows that Golden Living attempted to care for Ms. Horton, but that she often refused treatment or intentionally made treatment difficult.

3

For example, the evidence shows that the Golden Living staff attempted to reposition Ms. Horton often to take weight off of her pressure ulcer. Lisa Sawyer, a nurse at Golden Living, testified that the staff would reposition Ms. Horton and use pillows to prop Ms. Horton on her side, so there was less weight was on her tailbone. (Deposition of Lisa Sawyer, Doc. 35-1, p. 11.) However, Nurse Sawyer, as well as Nurse Verdella Evans, testified that Ms. Horton would often take the pillows out from behind her and throw them onto the floor. (Sawyer, p. 11; Evans, p. 21.) Nurse Evans stated that "[f]rom day one she didn't want to turn." (Evans, p. 20.) Lucille Smith, Ms. Horton's daughter, was aware of the difficulties that the nurses at Golden Living had with repositioning Ms. Horton. Smith was told that Ms. Horton preferred to stay on her back as opposed to on her side. (Deposition of Lucille Smith, Doc. 40, p. 75-76.) Smith also testified that she saw pillows on the floor of Ms. Horton's room. (Smith, p. 76.)

The Golden Living staff also attempted to treat Ms. Horton's pressure ulcer by bandaging the wound, but Ms. Horton often removed the bandages. Nurse Sawyer recalled that Ms. Horton would "take them off and throw them on the floor." (Sawyer, p. 34-35.) Nurse Evans, the wound care specialist, testified that Ms. Horton would take off her heel protectors and the bandages that were over her ulcer. (Evans, p. 58.)

The Golden Living staff took other steps to treat the wound as well. When Ms. Horton was diagnosed with a pressure ulcer at the hospital, the staff at Golden Living arranged for her mattress to be replaced with an air mattress.

4

(Evans, p. 38.) Nurse Evans testified that the air mattress was placed on Ms. Horton's bed on December 22, 2009 as part of her care plan. (Evans, p. 38.) In evaluating Ms. Horton's pressure ulcer, Nurse Evans noted that "[i]t did get pretty deep. … But it did – the wound did get worser because she did – she wouldn't turn, refused to turn, I guess you call it. We could not keep pressure off the wound." (Evans, p. 41-42.) She further testified that it developed into a pressure ulcer because "she would not comply with the care that we tried to give her." (Evans, p. 42.)

As to the claims of negligence relating to Ms. Horton's state of dehydration, there is no evidence that Golden Living's conduct equated to a level that merits punitive damages. Ms. Horton, who suffered from a stroke before entering Golden Living, was able to eat with her left hand with some assistance (Evans, p. 35), but Ms. Horton would often refuse to eat or drink (Evans, p. 35; Sawyer, p. 14). Based on her refusal to eat or drink, Golden Living arranged for Ms. Horton to have a PEG feeding tube to provide her with water and nutrition. (DSMF ¶ 22.) However, Nurse Evans testified that Ms. Horton pulled her PEG tube out several times. (Evans, p. 36.) Ms. Horton's doctor and her daughter, Lucille Smith, were aware that Ms. Horton pulled out her tube. (Sawyer, p. 35; Smith, p. 74.) Terry Lee, Ms. Horton's brother, testified that he heard about Ms. Horton attempting to remove her PEG tube. (Deposition of Terry Lee, Doc. 42, p. 25-27.) He also testified that he saw Ms. Horton's hands wrapped in gauze in an attempt to keep Ms. Horton from attempting to remove her PEG tube. (Lee, p. 26-27.)

The only evidence that Plaintiff submitted to argue that the facts of this case warrant punitive damages is an expert report from Kirk J. Mauro, M.D., a physiatrist at Medical Rehabilitation Specialists and Injury Care Clinic. (Doc. 45-1.) Dr. Mauro reviewed Ms. Horton's file and issued a preliminary report which declares that the care Ms. Horton received at Golden Living "substantially departed from the standard of care due a resident of a Skilled Nursing Facility." (Doc. 45-1.) He further stated that the staff at Golden Living was "reckless" in caring for Ms. Horton. (Id.) His report states that Golden Living's staff failed to properly document Ms. Horton's deteriorating condition and failed to amend the treatment plan when the plan was not working. (Id.) However, Dr. Mauro's conclusions do not support imposing punitive damages on Defendants, or even presenting the issue of punitive damages as a jury question.[2]

The standard in Georgia for punitive damages calls for "circumstances of aggravation or outrage." Lindsey, 312 Ga. App. at 534, 718 S.E.2d at 807. Those circumstances are absent in this case. At most, this case involves negligence or gross negligence. There is simply no evidence on the record of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of

---

[2] In an attempt to prove aggravating circumstances, Plaintiff also cites the deposition testimony of Charlie Lee, Ms. Horton's brother, and Lucille Smith, Ms. Horton's daughter, who both testified to finding Ms. Horton "saturated in urine and covered in feces." (Doc. 45, p. 7.) However, the evidence shows that Ms. Horton was incontinent, and the staff at Golden Living cleaned up within a reasonable amount of time. While Lee and Smith were both disturbed by seeing Ms. Horton in that state, the Court does not find that this situation amounts to an aggravating circumstance worthy of punitive damages.

care which would raise the presumption of conscious indifference to consequences" as required for punitive damages according to O.C.G.A. § 51-12-5.1(b). Thus, Defendants' Motion for Partial Summary Judgment is granted and punitive damages are not available as a remedy for Plaintiff.

There are no dispositive motions pending in this case, and thus, this case is now ready to proceed to trial. The Court orders the Clerk of the Court to set this case for trial in the October 2012 trial term in Valdosta, Georgia.

**SO ORDERED,** this 25th day of June, 2012.

*s/ Hugh Lawson*
HUGH LAWSON, SENIOR JUDGE

ebr